[Dkt. No. 12]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| SOLID ROCK BAPTIST CHURCH; BIBLE BAPTIST CHURCH OF CLEMENTON; ANDREW REESE; CHARLES CLARK, JR.; and CHARLES CLARK III, | |
| Plaintiffs, | Civ. No. 20-6805(RMB/JS) |
| v. | **OPINION** |
| PHILIP D. MURPHY, Governor of the State of New Jersey; GURBIR S. GREWAL, Attorney General of the State of New Jersey; PATRICK J. CALLAHAN, Superintendent of State Police and State Director of Emergency Management, | |
| Defendants. | |

**APPEARANCES:**

REILLY, McDEVITT & HEINRICH, P.C.
By: Brian Tome, Esq.
3 Executive Campus, Suite 310
Cherry Hill, New Jersey 08002

ZIMOLONG, LLC
By: Walter Stephen Zimolong III, Esq.
P.O. Box 552
Villanova, Pennsylvania 19085

GIBBS & ASSOCIATES LAW FIRM, LLC
By: David C. Gibbs, Esq.; Seth J. Kraus, Esq.;
    Jonathan D. Gibbs, Esq.
6398 Thornberry Court
Mason, Ohio 45040

Counsel for Plaintiffs Solid Rock Baptist Church, Bible
Baptist Church of Clementon, Andrew Reese, Charles Clark,
Jr., and Charles Clark III

OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
By: Jeremy M. Feigenbaum, Assistant Attorney General; Daniel M.
    Vannella, Assistant Attorney General; and Michael C.
    Walters, Assistant Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 116
Trenton, New Jersey 08625
    Counsel for Defendants Governor Philip D. Murphy, Attorney
    General Gurbir S. Grewal, and Colonel Patrick J. Callahan


**RENÉE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

The United States Pledge of Allegiance speaks of "one
Nation under God, indivisible, with liberty and justice for
all," 4 U.S.C. § 4.  In the State of New Jersey, however, those
who wish to pray to God in their houses of worship, must be
divided.  Faced with a global pandemic of biblical proportions,
Governor Phil Murphy has promulgated various emergency executive
orders imposing attendance restrictions on large indoor
gatherings, including religious services.  As of the time of
this Opinion, a place of worship is limited to 25-percent
capacity, with attendance never to exceed 100 persons,
regardless of sanctuary size, for indoor religious services.

Plaintiffs bring this suit against Defendants New Jersey
Governor Philip D. Murphy, New Jersey Attorney General Gurbir S.
Grewal, and the New Jersey Superintendent of State Police and
State Director of Emergency Management, Colonel Patrick J.

Callahan (collectively, the "State" or "Defendants").  This
matter now comes before the Court upon Plaintiffs' Emergency
Motion for a Preliminary Injunction ("PI Motion")[Dkt. No. 12].
Invoking the U.S. Constitution, the New Jersey Constitution, and
their deep faith in a religious obligation to gather for
worship,[1] Plaintiffs challenge the Governor's Executive Orders
and seek an order allowing them to "continue [their] in-person,
indoor church services with more than 10 people while practicing
adequate social distancing and following all relevant safety
guidelines."  [PI Motion, at 18].

    The Court finds that the portion of Plaintiffs' motion
seeking permission to hold gatherings of more than 10 people has
been, in effect, granted through the enactment of Executive
Order No. 156.  At this juncture, the remaining aspects of
Plaintiffs' motion will be denied without prejudice.  The Court
will, however, allow Plaintiffs to amend their complaint if so
desired.

---

[1] Among other verses, Plaintiffs invoke Hebrews 10:25 ("Not
forsaking the assembling of ourselves together, as the manner of
some is but exhorting one another and so much the more as you
see the day approaching."). See Plaintiffs' Complaint [Dkt. No.
1], at 9.

I.   **FACTUAL BACKGROUND**

A.   ***Executive Orders on Gatherings***

On March 9, 2020, Governor Murphy issued Executive Order No. 103 ("EO 103"), declaring a State of Emergency and Public Health Emergency based on the dangers posed by the spread of the Coronavirus Disease 2019 ("COVID-19").[2]  In EO 103, Governor Murphy authorized Colonel Patrick Callahan to "take any such emergency measures as the State Director may determine necessary" to protect New Jersey citizens from exposure to COVID-19.  Since March, the State of New Jersey has experienced over 185,000 confirmed cases of COVID-19, contributing to almost 16,000 deaths.[3]

As COVID-19 spread around throughout New Jersey, Governor Murphy promulgated new emergency orders in relation to COVID-19. On March 16, 2020, Governor Murphy issued Executive Order No. 104 ("EO 104"), which limited all gatherings to "50 persons or fewer," with exceptions for various categories of businesses

---

[2] Two days later, on March 11, 2020, the World Health Organization declared that COVID-19 was a "pandemic," which means that there is "worldwide spread of a new disease."

[3] Johns Hopkins University, Coronavirus Resource Center, available at https://coronavirus.jhu.edu/ (accessed on August 19, 2020).

deemed "essential."[4] This directive, however, excluded "normal operations at airports, bus and train stations, medical facilities, office environments, factories, assemblages for the purpose of industrial or manufacturing work, construction sites, mass transit, or the purchase of groceries or consumer goods." EO 104, ¶ 1.

On March 21, 2020, Governor Murphy issued Executive Order No. 107 ("EO 107"), which canceled all "gatherings of individuals" and ordered all New Jersey residents to "remain home or at their place of residence," unless for approved reasons, such as "leaving the home for an "educational, religious, or political reason." Under EO 107, essential retail businesses could remain open, but were required to "abide by social distancing practices to the extent practicable while providing essential services."  EO 107 further instructed that essential businesses were required to make "all reasonable efforts to keep customers six feet apart and frequent use of sanitizing products on common surfaces." EO 107, ¶ 7.

The provision in EO 107 cancelling all "gatherings of individuals" also granted the State Director of Emergency Management "the discretion to make clarifications and issue

---

[4] EO 104 clarified that essential retail businesses excluded from the directive included: "grocery/food stores, pharmacies, medical supply stores, gas stations, healthcare facilities and ancillary stores within healthcare facilities." EO 104, ¶ 8.

orders related to this provision."  Apparently in coordination with the Governor's order, later that same day, March 21, 2020, Colonel Callahan issued Administrative Order No. 2020-4 (AO 2020-4), which "clarified that gatherings of 10 persons or fewer are presumed to be in compliance with the terms and intentions of [EO 107], unless clear evidence exists to the contrary." Governor Murphy formalized Colonel Callahan's interpretation in Executive Order No. 142 ("EO 142"), issued on May 13, 2020, which stated that "gatherings of 10 persons or fewer are in compliance with the terms of [EO 107], while gatherings of more than 10 persons are in violation of that Executive Order."

The executive orders did not draw a distinction between indoor and outdoor gatherings until May 22, 2020, when Governor Murphy issued Executive Order No. 148 ("EO 148").  In that order, Governor Murphy instructed that indoor gatherings would continue to be limited to "10 persons or fewer," but allowed for outdoor gatherings with "no more than 25 people at the same time."

While EO 148 remained in effect, from late May through early June 2020, cities in New Jersey saw massive protests in the aftermath of George Floyd's death in Minneapolis, Minnesota. During this period of time, hundreds, and sometimes thousands, of protestors gathered in the streets on a daily basis to protest Mr. Floyd's death and show support for the broader

"Black Lives Matter" movement.  As noted by Plaintiffs during oral argument, attendees at the social justice protests packed the streets in close proximity to one another while loudly chanting, yelling, and singing.  Although some protestors wore masks, many did not. See Oral Argument Transcript, July 28, 2020 ("Tr.")[Dkt. No. 30], at 14:4-14.  At times, these protests descended into chaos, violence, and destruction.

Although the protests stood in clear violation of EO 148, which limited outdoor gatherings to "no more than 25 people at the same time," Governor Murphy publicly expressed support for these protests. Id.  Plaintiffs highlighted the extent to which the State prioritized protest activity, emphasizing that Governor Murphy even joined the protestors and marched with them in streets. See id., at 14:9-12 ("it doesn't take long perusing the news to see even the Governor shoulder to shoulder with individuals clearly not following social distancing guidelines.").  In fact, at his daily COVID-19 briefing on June 1, 2020, Governor Murphy stated, "to anybody who goes out, you have the absolute right to go out and peacefully and rightfully protest." See Governor Phil Murphy, Transcript of June 1st, 2020 Coronavirus Briefing ("Murphy Briefing, 6/1").[5]  To Plaintiffs,

---

[5] Available at: https://nj.gov/governor/news/news/ 562020/approved/20200601c.shtml (accessed on August 19, 2020).

the Governor's partisan conduct demonstrated "viewpoint discrimination as well as just plain basic uneven treatment." Tr., at 15:1-2.

Undeniably, the Governor's stance stood in contrast to his previous public statements on different types of outdoor gatherings, such as weddings, parties, and "re-open" protests, for which participants had been issued widely publicized criminal citations.  Governor Murphy explained that this difference in treatment came down to a matter of what he personally deemed more urgent and important:

> It's one thing to protest -- I don't want to make light of this and I'll probably get lit up by everybody who owns a nail salon in the state. But it's one thing to protest what day nail salons are opening, and it's another to come out in peaceful protest, overwhelmingly, about somebody who was murdered right before our eyes, and is yet, if that weren't enough, yet another data point of the trail of data points that highlights systemic racism and the stain that slavery still leaves in our country today. I put those into different orbits.

Murphy Briefing, 6/1.

Eight days later, on June 9, 2020, Governor Murphy superseded EO 148 by issuing Executive Order No. 152 ("EO 152"), which stated that indoor gatherings would be allowed, but would be "limited to 25% of the capacity of the room in which it takes place, but regardless of the capacity of the room, such limit shall never be larger than 50 persons or smaller than 10

8

persons."  EO 152 also allowed outdoor gatherings "limited to 100 persons or fewer."  Most notably, EO 152 created an exemption: "[w]here the outdoor gathering is a religious service or political activity, such as a protest, the gathering is not required to comply with [the numerical capacity limits] of this Order."  Governor Murphy explained that, "[g]iven the growing body of evidence showing the reduced risk of transmission outdoors, we believe such a rule appropriately prioritizes individuals' rights to speak and worship freely."  Governor Phil Murphy, June 9th, 2020 Coronavirus Briefing Transcript ("Murphy Briefing, 6/9").[6]

Although EO 152 prospectively cleared up the issue of unequal treatment for outdoor First Amendment gatherings, the State still faced a constitutional conundrum retrospectively, having previously issued criminal citations for some outdoor religious gatherings and "re-open" protests.  Apparently recognizing that the state had preferred certain types of First Amendment activity over others, in a memorandum issued on June 17, 2020, New Jersey Attorney General Gurbir Grewal announced that he would direct prosecutors to dismiss charges against those cited for outdoor First Amendment activity prior to EO

---

[6] Available at: https://nj.gov/governor/news/news/ 562020/approved/20200609b.shtml (accessed on August 19, 2020).

152.   In an advisory memorandum, the Attorney General stated as follows:

> Last week, Governor Murphy announced that, going forward, all outdoor political activity and outdoor worship services would be permitted, without any limitation on the number of individuals permitted to gather for such activities. As articulated in Executive Order No. 152 the Governor's decision was based both on the lower risks of COVID-19 transmission outdoors and on the societal importance of these activities. <u>To ensure that all outdoor political activities and outdoor worship services receive uniform treatment, I am directing prosecutors to move to dismiss any Executive Order violations previously filed for such conduct, despite the initial probable cause determination or appropriateness of the violation at the time it was issued.</u> Based on data maintained by the Division of Criminal Justice, there were five individuals who received summonses for organizing outdoor political protests and religious services in violation of Orders prior to the issuance of Executive Order No. 152; no individual protestors or worshipers have been cited to date.

New Jersey Attorney General Gurbir S. Grewal, <u>Guidance Regarding Municipal Prosecutors' Discretion in Prosecuting COVID-19 Related Offenses</u>, June 17, 2020 ("NJAG Mem."), at p. 4 (emphasis added).

As lamented by counsel for Plaintiffs, however, the Attorney General's memorandum only added salt to their religious wounds.  The Attorney General's action directed the dismissal of charges against those cited for <u>outdoor</u> First Amendment activity

10

prior to EO 152, but did not dismiss charges against those cited for <u>indoor</u> First Amendment activity, such as Plaintiffs, even if the citations were issued during the period of time when the Executive Orders did not distinguish between the risks associated with indoor and outdoor activity.

On June 22, 2020, after Plaintiffs had filed the instant Motion, Governor Murphy issued Executive Order No. 156 ("EO 156"), which stated that "the number of individuals at indoor gatherings shall be limited to 25% of the capacity of the room in which it takes place, but regardless of the capacity of the room, such limit shall never be larger than 100 persons or smaller than 10 persons."  EO 156 also allowed outdoor gatherings of "250 persons or fewer," but stated that "an outdoor gathering that is a religious service or political activity, such as a protest, is not required to comply with the numerical limit on persons."  As of the time of this Opinion, EO 156 remains in effect as to indoor religious services.[7]

**B.**   ***Bible Baptist Church of Clementon***

Plaintiff Bible Baptist Church ("Bible Baptist") has been operating since 1886 in Clementon, New Jersey, where its

---

[7] Governor Murphy has issued various subsequent Executive Orders on the subject of indoor and outdoor gatherings, but the relevant restrictions remain unchanged as they pertain to places of worship.

constituents regularly gather for in-person religious services multiple times per week. See Compl., ¶¶ 30-31. Bible Baptist is a small congregation, normally having 70 people at its weekly leadership assembly (seating capacity is 75). Reese Cert. [Dkt. No. 12-3], at 4, ¶ 19. As alleged in the Complaint, Bible Baptist's pastor, Plaintiff Andrew Reese, along with the church's congregants, "believe that a physical assembly in one place on the Lord's day, for mid-week services, revivals, other special religious worship meetings, and for Christian fellowship is an essential part of their worship and that failure to assemble is a sin in violation of God's commands as they interpret the *Holy Bible*." Compl., ¶ 33. In fact, Bible Baptist places such an emphasis on in-person attendance at services, that membership is automatically terminated if a member goes six months without attending at least one regular worship service. Id., ¶¶ 34-35. Despite this belief, from March 23, 2020 until May 20, 2020, Bible Baptist did not hold indoor church services, but instead, livestreamed services online. Id., ¶ 37.

On May 20, 2020, while EO 107's ban on non-essential gatherings of more than 10 people was still in effect, Bible Baptist held its mid-week worship service with more than 10 people in the sanctuary. Compl., ¶ 38. Although Bible Baptist's sanctuary has a seating capacity of 75 people, in preparation for the service, the church lowered the maximum capacity to 38

12

people to allow for social distancing. Id., ¶ 43.  The sanctuary
was also fully sanitized. Id., ¶ 39.  During the service, all
attendees wore a mask and all individuals, other than families,
sat at least 6-feet apart. Id., ¶ 38.  The following day, on May
21, 2020, Clementon Police Chief Charles Grover issued a
criminal complaint to Pastor Reese, charging him with "opening
Bible Baptist Church on May 20, 2020 and facilitating a
gathering of more than 10 people on the premises of the Church
in violation of Executive Order 107 in violation of APP. A:9-
50." Id., ¶ 40.

        After fully sanitizing all surfaces in the sanctuary, Bible
Baptist held two religious worship services indoors with more
than 10 people in the sanctuary on Sunday, May 24, 2020. Compl.,
¶ 41.  The sanctuary was sanitized between the services and all
individuals in attendance, other than families, sat at least 6-
feet apart and wore a mask. Id.  On that day, Clementon police
officers arrived at the church before each of the two services.
Although the police officers did not disrupt either service,
following the services, Chief Grover once again swore out a
criminal complaint charging Pastor Reese with violating EO 107.
Id., ¶ 42.  Pastor Reese has received "multiple tickets."  Reese
Cert., at 2, ¶ 4.

        As confirmed at oral argument, the criminal charges against
Pastor Reese are still pending, but have been stayed pending the

outcome of this matter. See Tr., at 6:4-11.  Bible Baptist and
Pastor Reese contend that their First Amendment rights to freely
assemble and exercise their religion by holding indoor worship
services remain impeded by the threat of prosecution and
imprisonment under the currently applicable Executive Orders.
See, e.g., Reese Cert., at 5, ¶ 20. ("Despite the threat of
criminal prosecution, my and our faith compel me and Bible
Baptist members to continue to assemble as commanded by the Lord
in His Word, the *Holy Bible*"). Relevantly, although EO 107 has
been superseded, the type of services held by Bible Baptist
remain prohibited under EO 156.

C.   ***Solid Rock Baptist Church of West Berlin***

Plaintiff Solid Rock Baptist Church of West Berlin ("Solid
Rock") has been operating since 1981 in Berlin, New Jersey,
where its constituents regularly gather for in-person religious
services multiple times per week. Compl., ¶¶ 47-48.  Solid Rock
is co-pastored by Plaintiff Charles Clark, Jr. and his son,
Plaintiff Charles Clark, III. Id., ¶¶ 49-50.  The Solid Rock
sanctuary is able to seat up to 1000 people.  Clark Cert. [Dkt.
No. 12-4], at 4, ¶ 10.

As alleged in the Complaint, Solid Rock and its pastors
believe that "physical assembly in one place on the Lord's day,
for mid-week services, revivals, and other special religious

14

worship meetings is an essential part of their worship and that failure to assemble is a sin in violation of God's commands as they interpret the Holy Bible." Compl., ¶ 51.  Similar to Bible Baptist, Solid Rock holds in-person attendance at services to such a high degree of importance that membership is subject to automatic termination if an individual does not attend at least one service in a four-month period. Id., ¶¶ 52-53.  Indeed, Solid Rock has terminated the membership of several individuals for nonattendance. Clark Cert., at 4, ¶ 9.  Nonetheless, to comply with the Governor's orders, from March 23, 2020 until May 24, 2020, Solid Rock did not hold any indoor worship services, but instead, like Bible Baptist, livestreamed services online. Compl., ¶ 55.

On May 15, 2020, Pastor Clark notified Governor Murphy, by letter, that Solid Rock intended to resume indoor worship services on May 24, 2020. Id., ¶ 56.  In the letter, Pastor Clark stated "[w]e will be safe, sanitized, and use social distancing," but also requested that the Governor declare churches to be "essential" businesses. Id.  On May 18, 2020, counsel for Solid Rock wrote to Governor Murphy's office to express their constitutional concerns regarding the restrictions imposed by EO 107 and to inform the Governor that Solid Rock intended to open for indoor services on May 24, 2020. Id., ¶ 57. Solid Rock's counsel requested confirmation from the Governor

that churches could resume indoor services, but the Governor's office did not respond to either letter. Id., ¶ 58. Instead, on May 23, 2020, Camden County public safety officers allegedly installed cameras outside Solid Rock. Id., ¶ 59.

On Sunday, May 24, 2020, Solid Rock held two religious worship services indoors with more than 10 people in the sanctuary. Compl., ¶ 58.  Solid Rock, which is a large congregation that has a sanctuary that can normally hold 1000 people, permitted no more than 250 people in the sanctuary to comply with social distancing requirements. Id.  Every attendee had their temperature checked with a touchless thermometer and those with a temperature of 100.4° and above were not permitted to enter the building. Id.  Every individual attending, other than families, sat at least 6-feet apart and wore a mask. Members were also required to make reservations to attend the Sunday services so that the church could enforce its social distancing protocols. Id.

Police officers did not disrupt either service, but on Monday, May 25, 2020, Lt. Michael Scheer of the Berlin Borough Police Department issued criminal complaints to both Pastor Clark, Jr. and Pastor Clark, III, charging them with "opening Solid Rock Church [sic.] on 5/24/20 @ 10 am [and 5:30pm] facilitating a gathering over 10 people in violation of EO 107.

16

In violation of APP. A:9-50." Compl., ¶ 60-61.  Each has received five tickets for violating the Executive Orders.

As confirmed at oral argument, the charges against Pastor Clark, Jr. and Pastor Clark, III are still pending. See Tr., at 6:4-11.  Solid Rock, Pastor Clark, Jr., and Pastor Clark, III contend that their First Amendment rights to freely assemble and exercise their religion by holding indoor worship services remain impeded by the threat of prosecution and imprisonment under the Executive Orders.  See, e.g., Clark Cert., at 6, ¶ 19 ("Despite the threat of criminal prosecution, my and our faith require me and Solid Rock members to continue to assemble as commanded by the Lord in His Word, the *Holy Bible*").  Relevantly, although EO 107 has been superseded, the type of services held by Solid Rock remain prohibited under EO 156.

## II.  <u>STANDARD OF REVIEW</u>

When evaluating a plaintiff's motion for a preliminary injunction, the district court considers four factors: "(1) a likelihood of success on the merits; (2) that [they] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708 (3d Cir. 2004).  "If a plaintiff meets the first two requirements, the District Court determines in its sound discretion whether

17

all four factors, taken together, balance in favor of granting the relief sought." Fulton v. City of Philadelphia, 922 F.3d 140, 152 (3d Cir. 2019), cert. granted sub nom. Fulton v. City of Philadelphia, Pennsylvania, 140 S. Ct. 1104 (2020).  However, "[p]reliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." Lane v. New Jersey, 725 F. App'x 185, 187 (3d Cir. 2018)(quoting Kos Pharms., Inc., 369 F.3d at 708).

## III. **DISCUSSION**

The Free Exercise Clause of the First Amendment, which applies to state actions pursuant to the Fourteenth Amendment, Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." When religiously motivated conduct comes into conflict with a law or government action, the analysis of a free exercise claim depends on the nature of the challenged law or government action. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 165 (3d Cir.2002).  If the government action is neither "neutral" (discriminates against religiously motivated conduct) nor "generally applicable" (enforced against conduct that is only regulated when performed for religious purposes), strict scrutiny applies, and the government action violates the Free Exercise Clause unless it is narrowly tailored

18

to advance a compelling government interest. Id.  However, if a
government action is "neutral" and "generally applicable," and
burdens religious conduct only incidentally, the action is
permissible if it is rationally related to a legitimate
government objective. Id.

In this matter, Plaintiffs allege that Governor Murphy's
Executive Orders, on their face and as applied,
unconstitutionally infringe upon their First Amendment rights to
freely assemble and exercise their religious beliefs by
suppressing their ability to gather for in-person indoor worship
services.  In turn, the State argues that the Executive Orders
are consistent with the Free Exercise Clause because they impose
burdens on analogous religious and secular activities alike.

### A.   *Neutrality and General Applicability*

As Plaintiffs correctly state, a government action is not
considered neutral and generally applicable if it specifically
targets or burdens religiously motivated conduct but exempts
substantial comparable conduct that is not religiously
motivated. See Tenafly, 309 F.3d at 165-166 (citing Church of
the Lukumi Babalu Aye., Inc. v. Hialeah, 508 U.S. 520, 537
(1993)).  At oral argument, Plaintiffs primarily argued that the
Governor's capacity restrictions on indoor gatherings are not
neutral or generally applicable because they impermissibly favor

19

secular indoor retail establishments and public places, such as airports and train stations, which are not subject to the same limitations of 25-percent capacity and 100-person maximum attendance. Tr., at 12:5-13:16.[8]

In response, the State countered at oral argument that the types of indoor retail establishments and public places that are exempted from the Executive Orders (most specifically, the 100 capacity) are substantively different in nature than places of worship. See Tr., at 52:25-53:3 (contending that "individual gatherings, much more than stores or airports or offices or anything else, have been linked to serious outbreaks of COVID-19 even from just one or two asymptomatic attendees"). The State

---

[8] It is important to note that at oral argument the parties focused much of their attention on the 100-person capacity restriction set forth by Executive Order 156, which was decreed after the filing of the within Motion.  This is relevant because at the time of the filing for the requested injunctive relief Plaintiffs sought an order allowing it to continue indoor church services with more than ten people.  That request has been mooted by Executive Order 156 (as well as Executive Order 152 issued days before the instant Complaint) and Defendants would have no basis to oppose relief from the 10-person limitation, and as such, that relief has been effectively granted, at least in part.  What the parties do quarrel about is exactly how many people in excess of 10 may attend an indoor service, specifically, the legality of the 100-person numerical cap. Although an amendment of the pleading would have been procedurally proper and prudent, the Court need not delve into such procedural analysis because even if the Complaint were amended to challenge the 100-capacity limitation, as Plaintiffs did at oral argument, the challenge would not succeed for the reasons set forth herein.

acknowledged that some exempted places experience high foot traffic, but explained that the more transitory and superficial nature of interactions in these places poses a lower risk of transmission than the type of interactions that occur at religious services, where attendees sing, chant, and sit near each other for an extended period of time.[9]  The State further pressed that the nature of interactions at indoor religious services are more akin to those that occur at large indoor gathering places, such as concert venues, movie theaters, and dining establishments, which have all been forced to remain closed under Governor Murphy's Executive Orders.

Plaintiffs do not dispute that places of worship are treated more favorably than indoor recreational facilities, like movie theaters, but dispute that those types of business are more appropriate comparisons than regular retail businesses, airports, or train stations.  Plaintiffs, however, do not point to any scientific or anecdotal evidence to support their posited comparators.

---

[9] At oral argument, the State argued that "[i]f you have 50 people in an airport, whether or not they're waiting for the same or different flights, they are extremely unlikely to be [] interacting with each other... the risk of us interacting and therefore having the kind of sustained person-to-person interaction that risks COVID-19 spread goes up considerably" at large communal gatherings.

In May of this year, the Supreme Court considered whether to enjoin an emergency order from California, which was nearly identical to Executive Order No. 156.  That order limits religious gatherings to "25% of building capacity or a maximum of 100 attendees," but allows "essential" retail establishments to remain open without the same restrictions. See South Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020). Chief Justice Roberts concurred in the Supreme Court's decision to deny injunctive relief, noting:

> Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time.  And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

Id.

Moreover, just last month, the Supreme Court weighed the constitutionality of Nevada's even harsher restrictions, which limit attendance at religious services to "no more than 50 persons," regardless of a venue's size or social distancing measures implemented, while allowing casinos and other entertainment facilities to open at 50-percent of their maximum capacity, with no numerical limit on attendance. Calvary Chapel

_Dayton Valley v. Sisolak, et al._, 591 U.S. ___ (2020)(slip op.,
at 1).  The Supreme Court allowed the restrictions to stand.
Under Nevada's restrictions, a casino with a thousand-person
capacity could theoretically allow as many as 500 people on the
casino floor at the same time, but a church with the same, or
greater, capacity would still be capped at 50 attendees for a
worship service.  Although Nevada's restrictions placed on
religious services are undisputedly more severe than those
imposed on casinos, the Supreme Court, nonetheless, denied the
church injunctive relief.

In those cases, the Supreme Court deemed both California
and Nevada's capacity restrictions to be neutral and generally
applicable.  Because there is no meaningful distinction between
the orders in both cases and the Executive Orders here, this
Court is constitutionally duty-bound to find similarly as to New
Jersey's Executive Orders.

### B.  _Rational Basis Review_

Having concluded that Governor Murphy's restrictions on
large indoor gatherings are neutral and generally applicable on
their face, the Court now turns to whether they are rationally
related to a legitimate government objective.  In this case,
Bible Baptist (which has a 75-person capacity) desires to hold
services at 50-percent capacity with 38 people in attendance,

but is precluded by the State's 25-percent capacity limitation. Meanwhile, Solid Rock (which has an 1000-person capacity) desires to hold services at 25-percent capacity with 250 people in attendance, but is precluded by the State's 100-person cap on attendance.  As such, the Court must assess whether the State has a rational basis for both the 25-percent and 100-person limitations.

Governor Murphy's stated objective in enacting restrictions on large indoor gatherings was to reduce the risk of COVID-19 transmission.  At oral argument, the State explained that New Jersey "is especially concerned about communal events and group activities... that bring people together... because that just risks much more person-to-person interaction in a sustained way." Tr., at 54:22-25.  The State also justified loosening the restrictions on outdoor gatherings based on growing evidence that there is a much lower risk of transmission outdoors.

The State further argued that both the 25-percent capacity and 100-person numerical limitations are necessary because, otherwise, it would be too administratively difficult for the State's contact tracers to identify and speak to all relevant individuals in the event of an outbreak. Id., 52:17-54:9.  In explaining the justification for the 100-person numerical cap in the context of contact tracing, the State elaborated:

> So once you identify that a sport is likely
> to be an outbreak, what you need to do in that
> case is have a robust contact tracing program
> to be able to identify not just the people
> they interact with, but everyone that they've
> interacted with outside of that gathering
> then the people they've interacted with and
> so on and so forth.... So when you go up
> beyond this certain numerical limit, it's not
> just that our contact tracers have to talk to
> the additional 30 people in the room or 40
> people in the room to hit your capacity limit,
> they need to talk to everyone else that's in
> that room that they went and talked to after.
> So, let's say you have a hundred people but
> the capacity led to 250, the contact tracers
> don't have to just talk to 150 more people,
> they have to talk to 150 more people and
> everybody each of those people talked to. So
> it's orders of magnitude more than you would
> have at a gathering capped at a hundred.

Tr., at 53:3-21.

At oral argument the Court questioned the State about how it could rationalize the 100-person cap on attendance for indoor gatherings in places of worship while, under Executive Order No. 157 ("EO 157), issued on June 26, 2020, allowing casinos, and other similar indoor recreational centers, to open at 25-percent capacity without a 100-person cap on attendance. See EO 157, ¶ 7(a).[10]  The State argued that "[t]here is a lower risk in some

---

[10] The Court observes that the 25-percent capacity limitation in EO 157 also allows these secular indoor businesses to exclude employees when calculating compliance, but inexplicably, clergy and other pastoral employees are not excluded from being counted towards the 25-percent or 100-person capacity limitations on indoor gatherings.

of the casinos because, yes, there may be more people in the
overall hall but when you are at your slot machine you are not
actually particularly trying to interact with others and have
the sort of sustained person-to-person contact with large groups
of people like you would at communal events." Tr., at 55:1-7.
The State further explained that casinos remained subject to the
100-person cap on attendance for special events or gatherings,
such as poker or slot tournaments, where players were more
likely to interact with one another.

To be clear, the Court recognizes that reducing the
transmission of COVID-19 is a legitimate government objective.
But, like Plaintiffs, the Court is skeptical of the reasoning
for the precise limitations imposed.  For example, the Court is
puzzled as to why it would be any more administratively
difficult to perform contact tracing for 250 people who have
made reservations to attend worship services and sit in the same
place throughout the service, as done by the worshippers at
Solid Rock, than it would be to contact trace for a similar
number of people who can move freely from table-to-table or slot
machine-to-slot machine throughout a casino, and then visit a
neighboring casino. [11]  As discussed more fully <u>infra</u>, as

---

[11] As Plaintiffs question, it is also unclear how the State
arrived at the seemingly arbitrary 25-percent and 100-person
figures. Relatedly, the State has continually allowed places of
worship to hold services with 10 or fewer individuals,

Plaintiffs passionately and persuasively argue, at a minimum, the State's failure to undertake a more thoughtfully tailored approach to indoor religious activity, while pursuing nuanced and creative approaches to accommodate casinos, retail stores, transportation hubs, and schools, tends to suggest that accommodating religious activity was simply not a priority for the State.

Despite this Court's concerns, Supreme Court precedent counsels that States should be given broad deference when enacting regulations to protect public health and safety. Indeed, Chief Justice Roberts expressed this sentiment when concurring in the decision to deny injunctive relief in relation to nearly identical restrictions in South Bay:

> The precise question of when restrictions on particular social activities should be lifted

---

regardless of capacity or ability to social distance.  As discussed at oral argument, it may be coincidental, but it is interesting to note that the "10 person minimum" exemption exactly aligns with requirement under traditional Jewish law necessitating a quorum, or "minyan," of 10 adult males for a prayer service to take place.  This does seem to suggest, as Plaintiffs argue, that the State may have strategically gerrymandered exemptions, not for health and safety purposes, but rather to inoculate the State against legal challenges, such as one from Jewish groups who, absent the 10-person exemption, could have claimed that the Executive Orders prohibited prayer services.  The State's defense of the "10-person" exemption" was not persuasive.  If the exemption was truly intended to distinguish between "things that were gatherings versus simply two families having to be together at any given time," Tr., at 23:13-15, the State could have, for example, limited the "10-person" exemption to individuals gathered at private residences.

> during the pandemic is a dynamic and fact-
> intensive matter subject to reasonable
> disagreement. Our Constitution principally
> entrusts "[t]he safety and the health of the
> people" to the politically accountable
> officials of the States "to guard and
> protect." Jacobson v. Massachusetts, 197 U.S.
> 11, 38 (1905). When those officials
> "undertake[] to act in areas fraught with
> medical and scientific uncertainties," their
> latitude "must be especially broad." Marshall
> v. United States, 414 U.S. 417, 427 (1974).
> Where those broad limits are not exceeded,
> they should not be subject to second-guessing
> by an "unelected federal judiciary," which
> lacks the background, competence, and
> expertise to assess public health and is not
> accountable to the people. See Garcia v. San
> Antonio Metropolitan Transit Authority, 469
> U.S. 528, 545 (1985).

South Bay, 140 S. Ct. at 1613-14.

Counsel for Plaintiffs made an impassioned entreaty for
relief from the 25-percent and/or 100-person capacity
limitation.  For sure, such limitations are hard to swallow for
those who turn to prayer and fellowship, especially in times of
great hardship and suffering such as these.  Moreover,
Plaintiffs, who view worship services as "essential" to their
emotional and physical health and well-being, take little solace
in the fact that religious services are treated no worse than
indoor secular gathering places like movie theaters, performing
arts centers, and concert venues.

At oral argument, the State argued that "New Jersey is
absolutely doing everything that it can in the face of these

unprecedented challenges to accommodate worship in the state."
Tr., at 21:10-12.  Plaintiffs have made a convincing case
otherwise.  Given the sacred status of Free Exercise rights
under the First Amendment, the State could have developed more
narrowly tailored precautions to mitigate risk of transmission
while allowing Plaintiffs to gather for prayer services in
accord with their religious beliefs.

Plaintiffs have persuasively argued that the steps that
they took, such as limiting attendance, setting up a reservation
system, taking temperature of attendees, implementing social
distancing, requiring mask usage, and sanitizing the sanctuary
before and after services, are precisely the type of precautions
that could have been considered and implemented by the State if
it chose to prioritize indoor worship services to the same
extent that it prioritized outdoor non-religious protests.
Instead, the State painted with broad strokes and implemented a
"one church-size fits all" policy that makes no effort to
distinguish between the capacity and needs of small
congregations (like Bible Baptist) and large congregations (like
Solid Rock).  The difference in how the restrictions impact the
two Plaintiffs, with varied overall congregation sizes and
capacities, illustrates this point.[12]

---

[12] For example, assuming that the churches routinely fill to
capacity, Bible Baptist could accommodate all worshippers at 25%

Although Plaintiffs have made a compelling case that the Executive Orders were crafted with religious indifference, the Court may not invalidate the executive orders on those grounds alone. In the end, Plaintiffs have been unable to demonstrate that the restrictions on <u>indoor</u> gatherings were crafted with religious animus, have been applied unequally, or lack a rational relationship to a legitimate government objective. Additionally, at least on this record, Plaintiffs have not offered any evidence to refute the State's proffered justifications, such as the lessened risk of transmission at indoor spaces where contact is merely "transitory" or that the 100-person cap is necessary for the administrative feasibility of performing contact tracing. In light of these factors, and recent Supreme Court precedent, the Court must find that Plaintiffs have not met their burden of demonstrating that the restrictions on indoor religious gatherings have been applied discriminatorily or lack a rational relationship to a legitimate government interest.

Plaintiffs argue that this case is distinguishable from <u>South Bay</u>, <u>Calvary Chapel</u>, and another case recently considered

---

capacity if it held four services in a single day. This is a burden upon the church, undoubtedly, but one that could potentially be managed. In contrast, given the 100-person capacity limitation, Solid Rock would be forced to hold a staggering ten services per day to accommodate all worshippers.

in the District of New Jersey, <u>Dwelling Place Network, et al. v.
Murphy, et al.</u>, Civ. No. 20-6281 (RBK), and that the Court
should not consider those decisions as precedential.
Specifically, Plaintiffs argue that this case is different
because of their belief regarding the necessity of in-person
religious worship "is not merely a matter of personal
preference, but one of deep religious conviction, shared by an
organized group, and intimately related to daily living."
Tr., at 7:1-23 (quoting <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 216
(1972)).  In attempting to draw this distinction, Plaintiffs
suggest that they are faced with a more substantial burden than
plaintiffs in those cases.  Plaintiffs' position is
understandable, as they undoubtedly felt that their sincerely
held religious beliefs were under siege by government action,
but as a factual matter, so, too, did the plaintiffs in the
aforementioned cases. [13]  Regardless, this aspect is not relevant
for purposes of the Court's analysis.  In <u>Tenafly</u>, the Third

---

[13] The religious worshippers in all of the cases cited by
Plaintiffs did, in fact, claim that the in-person religious
services were biblically required.  Furthermore, although
Plaintiffs contend that adhering to their sincerely held
religious beliefs would subject them to the threat of
persecution and imprisonment, that is no longer the case. In
light of EO 156, though less than ideal, it is theoretically
possible, albeit burdensome, that Plaintiffs could accommodate
all those who wish to congregate in person, without violating
the Executive Orders, by holding a series of smaller worship
services on the same date.

Circuit explained that "[n]either the Supreme Court nor our
Court has intimated that only compulsory religious practices
fall within the ambit of the Free Exercise Clause."  309 F.3d at
171. Rather, burdens on conduct motivated by "beliefs which are
both sincerely held and religious in nature" may implicate the
Free Exercise Clause "without regard to whether [the conduct] is
mandatory." Id.  Therefore, the Court does not distinguish
between cases involving "optional" and "mandatory" religious
practices.

### C.    Selective Enforcement

At oral argument, Plaintiffs appeared to press a claim of
unlawful selective enforcement, pointing out that they were
issued criminal citations for gathering in violation of EO 107,
but the social protestors, who also clearly violated the order,
were not cited.  Plaintiffs also highlighted that Governor
Murphy praised social justice protestors who gathered in
contravention of EO 107, while expressing no such support for
religious worshippers.  Plaintiffs argued that this amounts to
"viewpoint discrimination as well as just plain basic uneven
treatment." Tr., at 15:1-2.  To these arguments, the Court makes
the following observations.  First, Plaintiffs appear to
conflate selective enforcement with the State's insensitivity
towards religious practices.  Second, Plaintiffs have not

asserted a selective enforcement cause of action in their Complaint.

As articulated by the Third Circuit, "in order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content." Brown v. City of Pittsburgh, 586 F.3d 263, 294 (3d Cir. 2009).

To be clear, Plaintiffs have not alleged that the restrictions on indoor gatherings have been selectively enforced against religious groups or that they were selectively targeted for surveillance and enforcement.[14]  To this point, at oral argument, Plaintiffs were unable to pinpoint any secular indoor gathering that received more favorable treatment from law enforcement than religious services.  This differs from New Jersey's restrictions on outdoor gatherings, which, prior to EO 152, were selectively enforced against non-preferred types of

---

[14] Rather, Plaintiffs, to a certain extent, induced law enforcement action by alerting the State and/or local police in advance that they intended to violate the restrictions on large gatherings.  Plaintiffs also admitted that they received warnings from law enforcement to cease and desist before criminal citations were issued. Tr., at 9:22-25.

First Amendment activity.  For example, while religious groups and "re-open" protestors received criminal citations for exceeding attendance limits and failing to abide by social distancing requirements set forth in the Executive Orders, the "social justice" protestors received no such citations.

The State justifies its prosecutorial decision not to issue citations to social justice protestors on the basis of the indoor/outdoor distinction and as a "public safety judgment" to avoid "serious civil unrest and serious conflict." Tr., at 42-15-43:17.  Plaintiffs find little comfort in this sentiment, arguing that it demonstrates a clearly discriminatory viewpoint preference for certain types of First Amendment Activity when enforcing the Executive Orders.

Plaintiffs explained that the exemption for outdoor First Amendment activities was created after the social justice protests began and did little to help them.  Indeed, Plaintiffs aptly note that outdoor religious services remained subject to attendance limitations at the time they held the services for which they received criminal citations.  Therefore, Plaintiffs, and other religious groups, were not necessarily aware that they could have retrospectively received favorable treatment if they had chosen to move their services outdoors.  Meanwhile, they are still facing criminal prosecution for their religious activity, while those who engaged in non-religious First Amendment

34

activity, which was equally prohibited at the time, were given free passes and after-the-fact dispensation.

Additionally, Plaintiffs suggest that EO 152's rollback of attendance limitations for outdoor First Amendment gatherings was really more geared towards providing cover to allow social justice protests, rather than to make an accommodation for religious worship.  On this point, counsel for Plaintiffs said that neither church viewed outdoor services as a viable alternative for their congregations, given the logistical challenges and costs associated with moving services outdoors. Tr., at 10:9-14 (noting that Plaintiffs "view it as a large potential burden given the inconsistencies of weather, mosquitoes, getting everyone corralled, the expense of tents, the expense of training their people to be able to structure everything outdoors as opposed to the practice that they are currently performing").

Finally, Plaintiffs insinuate that the State declined to accommodate religious worship and, instead, selectively enforced the Executive Orders against religious groups because they would quietly accept their fate and, in effect, "turn the other cheek." Plaintiffs in this case, however, had no desire to forego their sincerely held religious beliefs.

In short, the Court notes that Plaintiffs' argument for selective enforcement may, indeed, have merit.  However, because

Plaintiffs have not alleged such claim in their Complaint, the Court need not address it here.  The Court, however, will permit Plaintiffs to file an amended complaint within 30 days if they wish to pursue such a claim.[15]

## IV.  <u>CONCLUSION</u>

Urgently wishing not to "forsak[e] the assembling of [themselves] together," Plaintiffs are rightfully disillusioned that the State has not prioritized indoor religious activity to the same degree as outdoor social justice protests.  The State's apathy to sincerely held religious beliefs, alone, however, does not establish unequal treatment as it pertains to <u>indoor</u> gatherings.  Because the Court concludes that Plaintiffs have failed to establish that the Executive Orders, as they pertain to large indoor gatherings, are not facially neutral and generally applicable, the Court finds that Plaintiffs have not established a likelihood of success on the merits.

Accordingly, Plaintiffs' Emergency Motion for a Preliminary Injunction shall be **DENIED WITHOUT PREJUDICE.**  However, as previously noted, the Court will allow Plaintiffs to file an amended complaint if they wish to pursue a claim for selective

---

[15] This Court notes that it is unclear whether it has jurisdiction over such a claim while the related criminal action remains pending in state court.  As such, any amended complaint must adequately set forth the basis for jurisdiction.

enforcement, unless the State reexamines its pursuit of charges against Plaintiffs.

DATED: August 20, 2020

                                    <u>s/Renée Marie Bumb</u>
                                    HON. RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE